Take your time in setting up. I'm just gonna go ahead and call the case, but come on up whenever you're ready. Our last case is number 18-11645, Ascent Medical Group, LLC versus Humana Medical Plan. If you're gonna go through all those papers, you might need the full 25 minutes. I'm just joking with you. Is it Cooley? That's correct, thank you, Your Honor. Ms. Cooley, whenever you're ready. Good morning, may it please the court. I am Lauren Cooley here on behalf of Humana with my colleague, Kimberly Donovan. I'd like to begin this morning by focusing on three reasons why Humana, acting as a Medicare Advantage organization, properly removed as a federal officer. First, a Medicare Advantage organization is doing work that the federal government would be obligated by federal law to do itself, but for this partnership. As an MAO, it serves a public function conceived of and directed by the federal government, and that is the administration of Medicare benefits. That special relationship is demonstrated through statute, contract, and regulations. Second, as this court recognized in tenant, determinations regarding what is covered and how much to pay these claims is a federal responsibility of Medicare Advantage organizations determined by federal law, and tenant relied on 1395W22G1A and 42CFR422566 for that proposition. That's especially so for a non-contract provider like Ascent in this case, who is making these determinations solely pursuant to federal law, not any sort of private contractual arrangement. All right, let me ask you a question about the record. Section 2.2 of Humana's contract with the Office of Personnel Management states that Humana shall provide the benefits in the agreed upon brochure text found in Appendix A, but I didn't see a copy of this appendix in the record. Is it in the record? That more general appendix is not in place of that. What we've provided is specific plans that were available for members in this case, which is the same thing as the benefits that it would have laid out in that brochure. And where is that found in the record? That is found, I believe it's in the exhibit after the contract, and I can come back up on rebuttal with the particular citation for that. But the FEBA plan that was a representative plan that was available to one of the FEBA members that issue in this case is in the record, as is the contract that Humana entered into with OPM. And that is in the FEHB context, which is very similar to the Medicare Advantage context. Is the existence of a written contract, I mean in today's day and world you wouldn't have the relationship without it, but legally is the existence of a written contract and the specificity of certain terms, does that matter for your argument? It does, Your Honor. And if we look at Watson, you can think about this federal officer question at two levels. There's the broader lens, if you step back and think about what function is the private entity performing for the government, and then there's more granular level where you look at what's the evidence of this relationship? What specifically shows how, what closely supervised the private entity actually is? And I began my argument by speaking at the general level to address your question about the more specific level. In Watson, for instance, the court pointed out there was no contract, there was no payment, there was no evidence of a partnership here. In this case, there's ample evidence of that nature. There's in the MAO context, the very detailed contract that a Medicare Advantage plan enters into with CMS. And then in the FEHB context, the same with respect to OPM. And there are some specific aspects of those contracts that are very similar. For example, there is a provision in the CMS contract that the CMS must approve Medicare Advantage benefits. So the specific plans that are offered to Medicare beneficiaries have to be approved by CMS pursuant to federal law and the federal contract. CMS has the ability to terminate the contract if the MAO is not complying with federal standards, that's in Article VIII. Under Article VI, it shows CMS's broad powers to audit, to request financial information, to understand the details of how the program operates. And ultimately, the CMS exerts its power through that contractual process over Humana. And it's similar in the FEHB context under Section 2.2 and 3.2 of the contract with OPM. OPM must approve plans that are offered to FEHB members that include benefits and rates. There are similar provisions for auditing and termination and incorporation of the federal regs and statutes that govern administration of these plans. I have a question about your second cause of action, which was for unjust enrichment. And I read that claim as seeking reimbursement for non-emergency related services, is that right? That is a second claim, that's correct. Okay, and is there a contract or a statute or a regulation that governs the rate that Humana was required to pay for non-emergency related services? So under 422.214, a contract provider has to accept as payment in full the amount specified under Medicare fee schedule, under the Medicare regulations. So the amount- For non-emergency services? I thought that only related to emergency services. I believe it also applies to emergency services. I will confirm that. And I believe this is also addressed in the tenant decision for how non-contract providers are reimbursed, that that Medicare fee schedule rate determines payment. There are also provisions that govern providing, and like, as I mentioned before, CMS has to approve Medicare Advantage benefits. So there is still a regulatory oversight over all the types of benefits that a Medicare Advantage plan can offer in addition to emergency services. I would also point out that under supplemental jurisdiction, even if some of a sense claims would not be specifically directed by the federal regulations, they would still be brought in as part of the same general challenges to reimbursement practices. And for federal office removal, while there is evidence here of specific direction with respect to certain types of claims, that is not the level of, everything that Humana does does not have to be directed by their government. There can be discretion involved, and still the connection requirement is satisfied. There wouldn't be a relationship here with assent at all, but for the federal responsibilities that MAO has under federal law. And Humana satisfy the causation requirement for federal officer removal when neither the complaint nor the removal papers indicate whether Humana took any actions to recoup payments in administering the claims for the single patient, who I understand was covered by the FEHBA plan? So stepping back, Your Honor, there is no longer a causal connection requirement. The 2011 amendments by Congress to the Federal Officer Removal Act changed the language of the federal officer removal statute so that anything relating to an act you take under a federal officer entitles you to come into federal court. And this court in Caver recognized that that is a connection or an association requirement at most. And it is meant to be a very low hurdle. With respect to overpayment recovery. Regardless of the way you state the connection requirement, there is a connection requirement. That's correct, Your Honor. It doesn't say causation. I'll give you that. With respect to your specific question about overpayment recovery with respect to an FEHB member, whether an overpayment issue is involved in that particular member's claim is beyond the record at this point. But I would point out that under the OPM plan and under the contract, under section 2.3, there are specific procedures for overpayment recoupment provided there. So that to the extent that there is an overpayment claim that is governed by the contract, but even if there isn't specifically an overpayment issue, there's no interaction at all. There's no reason for Humana to be administering the claim at issue, but for its role as an FEHB carrier. And under anesthesiology associates and JAX, the decisions we discuss in our brief, the fact that the payment itself arises from the terms of the plan and wouldn't occur, but for that construct is enough to satisfy the connection requirement. Are you aware of the Fifth Circuit case of St. Charles Surgical Hospital versus Louisiana? I am, Your Honor. How does that impact your argument? Your Honor, in that case, I would also point out in the Fifth Circuit that the scope of the connection requirement is subject to en banc review, and that decision has not been decided yet. I believe St. Charles talks about a causal connection requirement and notes the evidence of specific direction in that case, but there is, in fact, the way that standard is interpreted is there's a decision forthcoming in the Fifth Circuit from the en banc court on that question. Taking back up in part on Judge Pryor's question, what is the agreement or understanding that is implicated when Umana took the actions that it allegedly took with regards to the claims by assent? What was it doing that was mandated, directed, suggested by some agreement with OPM or some other federal entity? Well, to start with, the federal reimbursement rates for non-contract providers are determined by federal law as the tenant case recognized, and the government has an interest financially in the costs that are incurred by these Medicare Advantage plans. Ultimately, the way that the bid process works for an MA plan is that the premiums that the government pays the plan are set on a per-member basis in advance, but then the following year, there's a bid process, and the costs to the MA plan that were incurred in the prior year are part of that, are reflected in that bid process. In other words, if costs go up to the MA plan, those are passed on to the government down the line. So there's a financial interest here in the efficiency of the program. There's an interest by the government in having its Medicare regulations followed. It has an interest in consistency and uniformity across the country and the ways in which these standards are interpreted, and that connects to whether or not state standards are allowed to displace the Medicare requirements. In the overpayment context, for example, overpayments ultimately result in costs to the broader system, and the government has an interest in keeping those costs down. Where does the maximum allowable fee referenced in the complaint come from? So it depends on the particular plan. In the ERISA plans, for example, it's described specifically, but that is one approach to paying for certain kinds of services by non-contract providers. When Humana is... But if you're applying... This case is complicated. Every time I think I understand it, I think I understand it less, but if the argument on your side includes a contention that you are acting as a federal officer for purposes of the federal officer removal statute, when you are applying a maximum allowable fee that is dictated by not a federal regulation or a federal contract by an ERISA plan, then it's just a mere government contract relationship that gives you the status you need. It doesn't matter where the fee is coming from. Is that right? That is right, in general. And I would emphasize again that the government retains oversight and approval over these plans and the way that benefits are paid. And also that since allegations here, though, go beyond that and implicate specifically practices that involve regulations that are directly on point, including... Not according to the complaint. Right, but under the Supreme Court precedent, you credit the defendant's theory of the case when you are considering the connection requirement. And that brings us back to the broader congressional purpose behind broad federal law. As long as that is substantiated, right? You have to explain what that is and tell us where everything can be found and submit whatever documents we need to review that are not in the federal code or the Code of Federal Regulations. Right, but to the extent that they're complaining about reimbursement practices for non-participating provider plans, in the MAO context, for example, Humana is restricted by federal law as to how it pays those claims. So how the defense of, well, we have to do this because of preemption or they're saying, well, no, you don't, or whatever the specifics are that would be litigated, that is a dispute for the federal court to decide. And the importance of that is illustrated, I think, both through the intent behind the removal amendments and behind the broad preemption provision for Medicare Advantage. Is there any, was there any claim that the so-called recoupment of alleged overpayments was also done by Humana in its capacity as a federal officer, someone acting on behalf of the US government with regard to these payments or not with regard to that specific part of the complaint? The overpayment claim is part of their challenge to our reimbursement practices, including for members of Medicare Advantage plans where we would be acting as an MAO or members of FEHB plans. They don't distinguish between those plans and we know those plans are at issue in this case. So an overpayment recovery is an example of something that we do, all of these practices, deciding how much to pay, deciding whether there's coverage in the first place, these are all things we do pursuant to the federal standards that govern these plans. And so the litigating exactly how that shakes out here under the federal officer removal statute and then under Congress's broad preemption provision, which is intended to bring federal operations into federal court, or sorry, to have federal law apply to federal operations, you marry those two together and I think it clearly shows congressional intent to have these federal defenses over federal operations consistently decided by federal court. And I think that the fact that there's a non-contract provider here is really significant. I think it's also significant that there are denials of coverage at issue in this case, including for members of Medicare Advantage plans. Denials of coverage are determined according to Medicare standards and those are responsibilities of an MAO pursuant to federal law. They're called coverage determinations and this court explained that framework very clearly in Tenet. And in fact, appeals from those decisions ultimately go up to the federal agency, to federal CMS. So these adjudications are part of the MAO's federal role in the system. Thank you. I would also point out that there's the FEHB precedent which looks at whether the acts are being done in connection with adjudicating claims for benefits under a federal health benefits program. There are reimbursement disputes at issue in both the NSB Geology Associates case and in the JACS case from the Eighth Circuit. And in both of those cases, this court and the Eighth Circuit determined that the fact that we were adjudicating those claims arose directly from our role as an MAO and that was enough to satisfy the low hurdle of the connection requirement. Why do you think the Sixth Circuit's decision in Humana Health is misguided or wrong? Your Honor, there are a couple ways in which it's misguided. First, I think it was looking at the wrong lens, at this at the wrong level. It wasn't appreciating that without a Medicare Advantage plan, that the Medicare beneficiaries who receive their benefits under Part C would ultimately receive those benefits under Parts A and B directly from the federal government. The government enacted Part C in order to take advantage of and partner with private entities for innovations in the private market. So the fact that MAOs might do things slightly differently from the government is a feature, not a bug in the system. It's part of the congressional design here, much like CAVER, where the federal government contracted with private entities to accomplish federal objectives and promote federal policies in a way that it didn't think it could accomplish as effectively by itself. I think OSCA overlooked that policy driver in that case and also overlooked the benefits to beneficiaries of having these choices between different types of plans and that that was part of the congressional purpose. I also think the government, excuse me, the Sixth Circuit overlooked the financial skin in the game that the government has in the way that these plans are administered and it viewed this as a purely private dispute, a dispute between a non-contract provider and an MA plan. And that's simply not the case when you're dealing with a non-contract provider because of all the reasons detailed in the tenant case where federal law determines how those claims are adjudicated and ultimately the increased cost of the system get passed on to the government. I think those things were overlooked in the OSCA case and this court has already analyzed this context differently although in the exhaustion context in the tenant case and I think the reasoning underlying the tenant decision is already inconsistent with the Sixth Circuit's decision in OSCA. I think the Sixth Circuit also, in fact, noted the FEHB context was different. It didn't explain how but it called attention to the JACS decision. So in this case, as you know, we have FEHB claims. It didn't explain why those contexts were distinct and I think that as we've discussed today, there are actually very notable similarities between the way the FEHB program operates and the way the Medicare Advantage program operates. Okay. So I would encourage this court not to follow the Sixth Circuit's approach in OSCA. There are some factual distinctions as well. We have denials of coverage here whereas OSCA was strictly an overpayment recovery case but I think the court should depart from OSCA more broadly as well. One other point on the connection requirement. The district court in this case adopted a rate versus right of payment distinction. It's not material here because there are denials but I would discourage the court from importing that distinction into the federal officer context from ERISA. It doesn't make sense here. It's inconsistent with the removal statute which requires only a connection. So the logic there is when you have a coverage determination, a right determination, that's different for purposes of federal officer removal from determining the reimbursement rate. But for non-contract providers, both of those things are determined by federal law and CMS requires us to follow federal law pursuant to our contract in administering these benefits. It's also an overly technocratic way to approach these cases where typically the coverage determination and the rate determination, many of these claims bring up both of them and it's difficult at the pleading stage to divorce the two. On the third prong of federal officer removal for colorable defenses, assent apparently effectively concedes that the express preemption provision would apply here or at least be a colorable defense to these claims. And as I mentioned earlier, it's not for this court to determine whether that defense has validity. It has to be colorable only. And that's part of the purpose behind federal officer removal is to have those defenses ultimately litigated on the merits in federal court. I see my time is running low. If I might spend a minute on the ERISA context as well. In this case, the provider could have brought its claims under 502A1B and is not allowed under Davila to frame a state law claim in order to evade the ERISA preemptive effect. Congress intended to make ERISA civil enforcement mechanism exclusive. And here assent has standing to sue. Its claim would arise under ERISA, including because it's bringing hybrid claims for denials. And I would also point out we have a non-participating provider, and which is again, a significant distinction here. The rates, the right to payment and the rate to payment all turn back to the ERISA plan. Well, with respect to the claim under the Florida statute for emergency services, doesn't that have, isn't that an independent state law basis? No, Your Honor, it isn't. The emergency services claim governs the rate of payment. First, we have denials at issue here that go beyond that, but with respect to the rate of payment, that ultimately still has to tie, you still have to start with the ERISA plan. That doesn't create coverage, the Florida statute. You look back to the ERISA plan, and if you look to the ERISA plan, you'll see that there is a methodology for determining how emergency services are reimbursed to non-participating providers. There is also, I think, important to point out that Assent itself alleges that it is a third-party beneficiary of the plans at issue. That's in paragraph 15 and 24 of its complaint, and it says that that is its basis for asserting these claims. So that's an essential predicate to its right to relief, to its rate of payment claim under Florida law. Is it your contention that, or was it your contention that these were all ERISA plans, or that there were some ERISA plans? There are some ERISA plans, Your Honor. And that was documented in your removal papers? That's correct, Your Honor. We have declarations that establish that there were several, many members involved. Many of the claimants that were submitted to us in connection with the complaint were ERISA plan members. And you can look at, for example, Appendix 598 and Appendix 795, and see how the fees for emergency services for non-network providers would be determined for these ERISA beneficiaries. But with regards to the ERISA removal part, not the federal officer part, isn't there a distinction between non-payment of claims and a dispute over the rate in the case law? There is in this circuit's case law. I would point out that we have denials at issue here, which is established in our removal papers. I believe that we also, that's at R9 at 13 to 14, and R12 at two to three. You could look there. But in addition to the fact that there are denials, those authorities- Where do they complain about denials? In their complaint, they describe in paragraph... I know what you're gonna cite. That's a very slender citation from the complaint. That's true, but they are claiming recovery for denials, and they haven't effectively refuted that. And you evaluate removal jurisdiction from the time of removal in the original complaint. But to further address- It says, you're talking about paragraph 10, right? I believe so, Your Honor. Okay. Humana has engaged in the practice of identifying alleged overpayments made to assent, and then undertaking self-help measures by deducting future payments due to assent from later submitted claims. How do we know that's a denial? There are more specific denial allegations. 11 says, to date, $670,000 in claims, ultimately due to assent, have been improperly paid, withheld, recouped, and or deducted. Where does it say denied? On appendix 39, paragraph 25, it talks about the basis for its unilateral denial of payment to assent and or payment adjustments made by reducing payment to assent. Appendix what, you said? A39, it's paragraph 25 of the complaint. And in that paragraph, which we cite in our briefs, it talks about Humana's failure to specify its basis for unilateral denial of payment to assent. Beyond the denial question, Your Honor, the cases in the circuit that deal with the rate versus right of payment all involve situations where there's a provider agreement. There's something independent to provide the right to a particular rate of payment at issue. And in this case, there is nothing of that nature. The only source of a right to payment is derived from the ERISA plan directly. All right, thank you. We've taken you over your time, and we want to give you some time for rebuttal. Thank you, Your Honor. Judge Triguboff. Good morning, Judge Jordan. Good morning. May it please the court, Craig Triguboff, on behalf of the Appellee Assent Medical Group. Let me go back, if I can, Judge Jordan, to a couple of your very good questions. The first dealt with whether or not Humana should be concerned at all about the Sixth Circuit's decision in the Ohio State chiropractic case. And respectfully, they should be concerned. First of all, it's not an outlier. In that case, the Sixth Circuit, excuse me, found exactly what we are suggesting here, and not just me, Judge Jordan, and members of this panel, but the same findings that have already been made by Judge Altanaga in the emergency services case, the orthopedic care specialties case, which Judge Middlebrooks decided, the Baptist Hospital versus WellCare case, which Judge Hoovler decided, the Sheridan Health Corp versus Aetna Health case, which Judge Bloom decided, and also, in part, the Baptist Hospital versus Humana case, which Judge Ungaro decided. And what were those decisions? It would be fair, though, there are district court opinions in the state all over the place. No doubt, but I will, and I must, sort of implore upon this court. These authorities that are coming out of the district courts here in the Southern District are in lockstep. And we're seeing this rate of payment, non-participating provider, state law claim case being resolved pretty uniformly. And it starts really, Judge Pryor, it almost comes back to, and I know you're familiar with Anesthesiology Associates, you sat on that case, I think, almost 15 years ago, where that rate of reimbursement versus right to payment, or rate of payment versus right to, I'm sorry, rate of payment versus right to payment distinction was drawn. But with respect to that Ohio State case, Judge Jordan, there was no federal officer statute removal found there. Again, like here, a non-participating provider, like Ascent. We don't have a contract with Humana. It was a claim involving recoupment of overpayments, just like we have here, and Judge Jordan, just like the questions you were asking counsel a moment ago, specific to the concept of recoupment, not denial of payments, but recoupment. And I'm gonna draw. There is some language in the complaint that talks about denials. And let me explain that. And Your Honor, that is true. And you know something? I almost feel like Senator Sanders here. I wrote the darn complaint, so I'll answer the question. We have brought a claim under 641.3155, which speaks to overpayments and recoupment practices that HMOs routinely undertake. And what they do here, and what we have claimed they have violated, is the following. When they claim they have overpaid us, there's a process where they have to alert us. They have to alert the provider and say, hey, listen, we've overpaid you for certain claims. That then triggers and gives the provider a right to contest and challenge and go through a process to say, no, you didn't. You paid us correctly, whatever that process is. But what Humana did here improperly, and as we've alleged in the complaint, is that they engaged in self-help. They took it upon themselves to claw back. By claw back monies they claim they overpaid us. By then denying the payment of claims to facilitate that. And that denial of payment wasn't based on a contract exclusion. In other words, they didn't say, by the way, we're not gonna pay you these new claims that are coming in because of some coverage issue. It's experimental. It's not medically necessary. Oh, no. What they did here was they, as we've alleged, they just basically said, we've overpaid you, so even though you're still rendering good medical services to our members, we're just gonna stop paying you on these other new claims, for whatever the reason, so that we can, in essence, recoup the money and skirt the statutory requirements and obligations that we have. That's why Judge Jordan, yes, is the word denial found in my complaint? Yes, it is, sir. But it doesn't have to do with a denial of benefits. It has to do with a denial of payment tied to, expressly, their self-help claw back under the Florida statute. I hope that addresses Your Honor's question. Let me speak very quickly, because again, I believe that the Ohio State case and the cases, the Florida District Court cases that I've cited to, should be well-received by this court and should control your disposition and your affirmance of the remand order. But let me speak, if I can, very briefly, excuse me, to three things. Obviously, the complaint, where again, we have alleged three distinct Florida state court claims. A violation of the emergency services statute. They didn't pay us what they're supposed to pay us. The rate of payment, whether it's the lesser of our charges or what is usual and customary in the community or what the parties could otherwise agree to. That's the statutory scheme and framework here in Florida under that statute. It doesn't implicate at all a coverage determination. It doesn't implicate at all the trier of fact or laws having to look at an ERISA plan document or Medicare or federal officer statute guidelines concerning payment. I think I agree with you on that claim, but what about the cause of action for unjust enrichment relating to non-emergency services? Sure, and again, Judge Pryor, that to me is a simple state law-based claim, which again, there is no. What's the state law statute or regulation? There isn't. It is merely a Florida common law. It's an action that sounds inequity. In other words, we've conferred a benefit. They've accepted it. They have knowledge of it. It would be inequitable for them to retain the benefit without paying us the proper amount of money. But isn't it also a claim that could have been brought under section 502A? No, and I'll tell you why. I'll tell you why that claim is not pursuable under ERISA, and that's a good question, Judge Pryor. Because this is a rate of payment, and I know this came up in Humana's briefs, and we see this argument being raised by them repeatedly in other matters. Just because we have an assignment, in other words, the right to bring this claim to get paid has been assigned to us by the patients. You go to a hospital, you sign various assignment documents. The only way this claim would fit, Your Honor, into your, Judge Pryor, into your question of concern, and that is, why couldn't you bring this under ERISA, is because of the exact rate of payment versus right to payment distinction. If I was bringing this claim under unjust enrichment, claiming that there was some denial of a benefit, I paid you premium dollars. This is the perfect example. I'm a member, I'm a Humana insured. I paid premium dollars to you, good money, and you denied coverage to me for something, right? That's an unjust enrichment claim that that member could bring, and absolutely should be bringing as a planned participant under ERISA, because it's challenging the right to payment or the right to coverage. Here, I don't have that standing, because that assignment doesn't give me the right to challenge coverage. It only gives me the right to go after Humana and get paid the amount of money that I'm entitled to. So, Judge Jordan, to simplify it, I don't have standing to bring an unjust enrichment claim under ERISA, because again, this is strictly a rate of payment governed by independent Florida law. I hope that answers. If an ERISA plan tells you which of those two alternatives to pay, does that trigger ERISA preemption? I've got an answer for that, Judge Jordan, and that is, interestingly enough, Humana's contracts, and we've cited this in our brief, Humana's contract contemplates a conflict, because the contract says, that Humana has with the government, says that if there is a conflict between ERISA law or federal law and state law concerning these very matters, state law controls. That's their contract with the federal government. So, the federal government, quite frankly, they knew, they know, that there are gonna be circumstances where in cases like this, and again, I know counsel raised this point, but this is not just a point to sort of gloss over. You're gonna have cases like this, and I think Judge Hoover recognized this. You've got two private parties in a dispute over an amount of money to be paid. That's what this is. And I think the good folks at CMS and at OPM recognized that and said, well, wait a second. If there's a state statute that governs the rate of payment to be paid, just like our emergency services statute, and just like our overpayment statute, we're gonna defer to that because that doesn't implicate us. My point was a little bit different. My question was a little bit different, so I probably didn't ask it correctly. I probably didn't hear it. I apologize. But you said when you started your presentation that on your first claim, Florida law required payment to you of either your billed rate or the customary usual rate. I'm paraphrasing, but is that correct? Yes, sir. The statute gives a sort of a three-pronged framework. It's either gonna be my client's charges, the lesser of my client's charges, or what is usual and customary for similar providers in the community, and that's usually expert witness-driven, or then lastly, if the parties could otherwise agree on an amount. So if an ERISA plan tells you to choose the customary rate in the community as opposed to the billed rate, does that trigger ERISA preemption? It would, but ERISA doesn't do that. ERISA doesn't tell us, and in fact, I will tell you, there are cases out there, Judge Jordan, I will think of it in a moment. I think one of them actually came out of Pennsylvania. I think it was involving Temple Hospital, where we're not even allowed, as part of Florida law, I think Baker County is a case that came out of the first or second DCA some years ago as well, we're not even allowed as part of the usual and customary analysis to put into play, for example, what Humana pays because of its government responsibilities. That's never gonna be, that's not a factor that Florida law lets us play by. So we're never even permitted to say, oh, but by the way, or they can't even use the fact that, well, wait a second, we pay you, we pay other providers a Medicare percentage. So that has to be factored into what's usual and customary. Now, you've gotta go based on, again, what is usual and customary for similarly situated. So again, in my case, I'm a non-participating provider. I'm rendering emergency services in Miami-Dade, Broward, Palm Beach County, Florida. I've got commercial cases, yeah. I've got some government, some commercial claims. I've got some government claims. Obviously, the government claims are part of the mix, but again, under the law, you can't throw in there for a whole bunch of reasons. How much money the government, or how much money would be entitled to under some government payment because that's just not fair. So again, in this particular case, what is usual and customary is going to be based on principally what Humana pays similarly situated providers. Again, what they're paying us, what they're paying similarly situated providers, and what we accept from those types of payors. So the ERISA, or government payment analysis, is not at play under Florida law concerning usual and customary. It's been carved out altogether. I hope that answers Your Honor's question. Let me speak briefly to the federal officer statute. Before you get into that, let me ask you a question that relates to the federal officer statute, but that language that you cited in the contract with CMS about state law controlling, I didn't see a similar provision in Humana's contract with OPM. Am I correct? I think you are correct about that, Judge Pryor. But let me speak to why the federal officer statute is nevertheless not a winning point for Humana. First of all, the three elements that would trigger jurisdiction. And Judge Dimitriles, Judge Dee, was correct when he found that there was no federal officer statute jurisdiction or ERISA jurisdiction. But with respect to federal officer statute elements, first of all, has Humana acted under a federal officer? And the answer is simply no. And the distinction that we see here and what the cases have told us is for us to look at whether this is a regulated relationship or whether in fact the government has delegated to an entity like Humana its duties. And here, it's absolutely clear. And again, I am glad that Humana spent a fair amount of time in its brief giving a fulsome overview of the various federal rules and regulations that regulate them. But nowhere is there any language that speaks to how the government is delegating to Humana how Humana has to pay my client under Florida law when there's a rate of payment contestation. And again, this is not the case, I know you've seen these cases, they've been briefed, where you have the jet engine inspector clearly operating under, when he's sued, operating under the FAA's thumb because the FAA even designated him as a designated aircraft inspector and that's why the federal court in that case had jurisdiction, right? That's an easy sort of case to kind of hang on to as you go through this analysis. But merely being a regulated entity, even highly regulated as the courts tell us, isn't in and of itself enough to trigger federal officer statute jurisdiction and satisfy the claim. And respectfully, Humana doesn't have an answer for that because the truth is they are highly regulated, I'll give them that. I think we can agree on that. But they were not delegated to pay my client how they're supposed to pay them under Florida law and under the emergency statute or otherwise abide by the overpayment statute. Number two, is there a causal connection or even a nexus between Humana's payment? And again, the answer is no for similar reasons. There is nothing about this dispute between private parties that shows some connection between what Humana has to pay us and its role as a Medicare Advantage plan. I mentioned this before. At no time in this case, whether the state court deals with it, we hope that it will, or if the district court deals with it, will the court, trier of fact or trier of law, have to look at that causal connection, that nexus, have to look at the contract that Humana has with OPM or the FEBA plan documents at all. It will have no bearing because again, all they're gonna have to look at is, did you pay a cent what you were obligated to pay them strictly under Florida law, statutory or common? So they don't carry the second prong. There just simply is no nexus. And lastly, they haven't raised, and I disagree with my colleague, we don't concede that they have federal defenses here. The federal defenses that they've alleged are not credible. One is that we have to somehow exhaust administrative remedies. No, we don't. The administrative remedies that are available in this case aren't available to a cent. Again, a non-participating provider, and we've cited in our brief to these examples. Number one, the administrative remedies that are available are only available to plan participants. We're not a plan participant. We're not an enrollee. And when you go back respectfully and look at the briefs, you'll see how we laid that out. Only enrollees can challenge a plan determination. Not my client. We're cut out of that process. To make it worse, the Humana contract with the government specifically addresses its contracted relationships with providers and what those rights and remedies are. I don't have that right. I didn't contract with Humana. My client didn't. For purposes of negotiating rates or contestation issues or grievance procedures, we're not covered there. So that defense respectfully is not credible under the law. With respect to preemption, I think we've covered the preemption issue already. Let me speak if I can to the ERISA issue. But before I do that, before I move on, if I may, I do want to speak to the Tenet case and just to make sure that this court can draw the distinction because that is an 11th Circuit decision. That case is easily distinguishable and I think when the court goes back and just reviews it, you will agree. That is expressly, expressly a right-to-payment case. And therefore, the non-participating provider had to exhaust administrative remedies, had to do it because the court there found, and I think Judge Pryor, this comes back to what you and I were discussing a few moments ago, the non-participating provider is standing in the shoes of the patient because again, there was a coverage denial in that case. So again, I can't emphasize enough to this good court the importance, the distinction between rate of payment and right-to-payment and the duties and the burdens that clients such as mine, parties that are like my client, have to deal with when we file lawsuits and pursue our claims so as to make sure that we are pursuing the right claims. But again, we're not standing in the shoes of anyone here. We're standing in our own shoes asking Humana to pay us what they are supposed to be paying us, the correct amount of money, strictly under Florida law. So I think that that should dispose of the tenant case, at least respectfully for purposes of your analysis here. With respect to ERISA, again, I think we covered a lot of this, I'll just comment briefly. Under the Davila case, which again, is the controlling authority, when you look at what are the elements to trigger complete ERISA preemption, number one, the claimant could have brought his claim under ERISA and I think we spoke about this before. I can't bring a claim under ERISA  or a challenge to benefits. I don't have that ability. That is not within ERISA's framework. So I can't cover item number one, or at least factor number one under Davila. And then separately, and Judge Jordan, this I think factors into I think the question you had of counsel, which is that there, is there any other independent legal duty that's implicated by the defendant's actions? And the answer is yes. Their duty to pay assent is strictly governed, again, we're a non-participating provider. We rendered almost exclusively emergency services. That independent legal duty to pay us is governed strictly under Florida state statute. It gives us, Judge Jordan, as you and I were discussing before, that framework to play under. Unjust enrichment, again, a good Florida common law claim gives us the right to pursue payment independent of ERISA for the services that we provided and to get fair reimbursement for. And of course, the statute that we cited to concerning the clawbacks and obviously their improper holding back of payment to recoup monies. Those are all independent claims that have no implication whatsoever in connection with an ERISA preemption analysis. Judge Kugler, it looks like you wanna say something to me. Well, I guess the question that I have, you keep going back and saying that state law sets all this and state law is the basis. Yes, sir. Et cetera, and I think I understand what you're saying, but with regard to the common law claim of unjust enrichment, that appears to me to be how you're getting it. Instead of fighting us on an original payment that was made on a claim two years ago, they're now deciding we overpaid it, so thus we're gonna keep it from a totally different customer now, a different patient down the road. And is that the basis of that? No, sir, let me clarify that for you if I can. Again, we have the three claims, the emergency statute claim, where as a non-par provider of emergency services, we're claiming you didn't pay us what you owe us under Florida law, the lesser of. I wanna know under the unjust enrichment. I'm going there right next. To the extent that we have also rendered services in a non-emergent setting that wouldn't trigger that first statutory analysis, that is the only claim, I believe respectfully, the only viable claim that we could have brought under Florida state law to recover for the services, the benefits that we conferred, and by the way, under Florida law, we are in essence third party beneficiary. What you're saying is that you perform services and you're due to be paid for those services? Yes, sir, it's that simple. Okay, all right, so is there position that the amount you should have been paid for those non-emergent services set by either an ERISA plan in the terms of the ERISA plan or by some type of federal regulation? No, it isn't, because at the end of the day, it's gonna be regulated by what is ultimately determined to be equitable under Florida law, because again, unjust enrichment, Judge Kugler, under Florida law, while it's not technically an equitable claim, it's equitable in nature, so a trier of fact. I understand that's the method, how you get it. I'm asking about where is the amount set? I think the amount is gonna come probably through the same analysis that is undertaken with respect to the emergency statute, because again. What is their argument? Well, their argument is it automatically defaults back to the CFR, and again. If that is their defense, how is that not then an issue that should be decided by the federal court? If their defense is, look, it doesn't make any difference the amount they're claiming. You can claim it through anything you want, implied contract, unjust enrichment. There's a lot of equitable things here. Yes, sir. But the amount that they're claiming should be or is set by a CFR ultimately, isn't that what they're claiming? They are, and let me see if I've got this answer for you. It still comes back, Judge Kugler, to the fact that this is still a rate of payment case, and it still comes back to if that is the case. Again, when you look at the authorities that have drawn that distinction, because this is still a challenge to the amount of money to be paid, not an underlying coverage issue or benefit issue, it is not proper for federal court jurisdiction. So I think, and maybe that's overly simplistic, but I believe that is the overarching analysis here. If this was a right to payment in terms of you denied coverage, Humana, we're a beneficiary, you were supposed to do this, and we paid you all of this money, and you didn't cover us for a heart transplant, a bone marrow transplant, whatever the case may be, that would trigger the government's payment obligation under those rights regulations. But if the federal government says this is the amount you pay for a heart transplant, X. Yes, in a case where a planned beneficiary says, which is not us, sues Humana and says, I paid you guys $10,000 a year in premiums, and now you're saying, after I did all of that, that I'm not gonna either get that money back, or if it's the doctor standing in the shoes saying, wait a second, I rendered these services, this was $10,000 worth of services, and now, Humana, you're saying I ain't paying it, and your only remedy in terms of the rate of payment is federal law, in that case, in that case, they're right. But not in this case, because this case, again, doesn't trigger right to payment, benefit plan analysis or review in any way, shape, or form. Again, it goes back to the same thing, Judge Kugler, where we're dealing with a simple dispute, and again, I apologize if I use the word simple, and I know it isn't, but it is still what it is. It is a dispute between these two private parties involving accounting issues. How much money do you owe us? And in this case, it's under a Florida statutory scheme or under a common law claim of unjust enrichment. But again, it comes back to rate of payment. That's the trigger, Judge Kugler. I hope I answered your question. The last point, and I see also I'm running low on time, I just want to address, just so that we're clear on this, because I know that Humana has raised this in its brief, and it came up before, I think it was you, Judge Jordan, who may have raised the issue. Our claims are not hybrid claims, and maybe, Judge Kugler, this may have been causing you a little bit of concern, too, which is, well, wait a second here. You may have an unjust enrichment claim that triggers federal jurisdiction. Don't know. But what we do know here is none of Humana's arguments here concerning a hybrid claim have merit. We haven't done anything. We haven't mixed all of this up for a reason. And Judge Jordan, you were correct at the very beginning. My claim, under that overcharge or overpayment and recoupment, doesn't speak to a denial of a benefit, and that's exactly what counsel is trying, I think, to present to the court. That's where you get the hybrid claims, where in one breath, I'm saying on behalf of my client, it's just a rate of payment case, and then, Judge Kugler, maybe I come back and say, well, it may be a right of payment case, too. That's not what we have here. This case is pure. This case is a pure rate of payment. The emergency statute only speaks to rate of reimbursement. Unjust enrichment speaks of rate of reimbursement, and that last statutory claim under 641.3155 has nothing to do with, and Humana has conflated that issue, but it has nothing to do with a denial of benefits, benefits, not payment, benefits, with what we have here, which is, again, very simply, they have withheld payment to us on claims coming in now in order to put money into their pocket to recover what they claim they overpaid us, but they didn't give us our statutory rights to challenge it. That is not a right to payment case, and that is not a hybrid that this court should say, you know, it's a close call. We should take jurisdiction. I see that I'm now out of time. If the court doesn't have any further questions, thank you all very, very much. Merry Christmas and happy holidays. Thank you. Your Honor, may it please the court, I'd like to start with a critical distinction here, and I'm gonna focus on the MAO context. We've got a lot of different statutory contexts running around. There is a clear federal statute and regulation that requires non-participating providers to accept and for us to pay as payment in full the Medicare rates for Medicare Advantage services that are administered by non-contract providers. That's CFR 422.214. It's not limited to just emergency. It's for all services provided by non-contract providers. There is federal law dictating how we pay these claims. We don't pay the MAF. Tell me the citation again. Sure, it's 42 CFR 422.214. That's in our briefs. We also have 42 USC 1395 W22K1. We have to pay the Medicare fee schedule to non-participating providers, and they are required to accept it. Part C has a very broad preemption provision that sweeps in anything relating to Medicare Advantage plans. These state statutes that set reimbursement rates are preempted by the Part C preemption provision. What we do when we- Are there cases to that effect? Much of what I'm discussing in the exhaustion context is in tenant. It's set out by this court in tenant. On the preemption side, how broad preemption reaches I think is clear from the text of the provision there. I don't think it's even debatable that- That means there are no cases. I'm not aware of a case that addresses MAO preemption specifically. I'd rely on our briefs there, but the standards established under Part C with respect to Medicare Advantage plans offered by Medicare Advantage organizations supersede any state law. There are very specific standards there for how we pay non-participating providers, which are set forth in our briefs. Overpayments tie into that process, as this court recognized in tenant as well. These are also all coverage determinations. A coverage determination that a non-participating provider has standing to pursue is not limited to the rate versus right. It includes the right to payment, but we're not relying on exhaustion. Again, we're relying on preemption. The Part C program is meant to be a federal program operated under federal rules. Common law claims, Florida statutory claims, these are imposing standards that are already governed by federal law, and they are displaced by the preemption provision. As to Article 9, the contract provision regarding state law, it says the state law applies only if applicable to Medicare Advantage plans. It's not applicable to Medicare Advantage plans if it's preempted. That is not meant to set aside the very clear federal law and federal regulations establishing preemption. The CMS contract requires us to comply with federal regulations and federal statutes, so it would make no sense to interpret that contractual provision to wipe out the preemptive force of the Medicare Advantage program. I would also point out, this is actually an easy case on the spectrum between mere compliance with the law and exercising the responsibilities of the federal government. In the Watson case, we had a situation where a private cigarette manufacturer was certifying that it was complying with federal requirements governing testing standards for its cigarettes. It was doing its own job under federal regulations. Here, we are doing the work of the federal government that the federal government would be required by law to do. We're not merely regulated. We're doing a federal job for the federal government by providing Medicare benefits, and we're doing that pursuant to specific and detailed control through the contract and through these regulations that I have mentioned. In the Watson case, there was nothing of that nature. This is much more like CAVER, where the government has set up a program to be administered in partnership with a private entity and has a specific contract in place to do so. With the respect to ERISA plans, whether the A598 and A75 set forth how the maximum allowable fee is determined, the methodology is different from Florida law. Davila is clear, and this court's precedent in Connecticut State Dental is clear as well, that you can't plead around an ERISA claim no matter what the form that you choose. To state your claim, if at the end of the day you're quibbling with the limited remedial rights that you have under the ERISA scheme, that claim is considered preempted, and ultimately, in this case with non-contract providers, you go back to the plan as the source of the right to relief. I see my time is expiring. If there are no further questions, I would ask the court to reverse. All right, thank you both very much. We're in recess until tomorrow.